# UNITED STATES DISTRICT COURT

for the

Western District of Oklahoma

**FILED**

JUL 22 2022

CARMELITA REEDER SHINN, CLERK
U.S. DIST. COURT, WESTERN DIST. OKLA.
BY _____, DEPUTY

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

A red Apple iphone andblack Apple iphone Model A1660
seized from Ambrocio Arroyo currently in custody
of the DEA , Oklahoma City

)
)
)
)
)
)

Case No. M-22- 529 -SM

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A.

located in the _____ Western _____ District of _____ Oklahoma _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 846 | Drug Conspiracy |
| 21 U.S.C. § 841 | Possession with Intent to Distribute Controlled Substances |

The application is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Robin Melodick, Special Agent, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: July 22, 2022

_____
*Judge's signature*

City and state: Oklahoma City, Oklahoma

SUZANNE MITCHELL, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

The property to be searched are described as: a red Apple iPhone with a cracked/broken panel and black Apple iPhone, Model A1660 with a black rubber case, Seized from Ambrocio ARROYO; hereinafter the "Devices". The Devices are currently located in secure evidence storage at DEA Oklahoma City, located at 901 NE 122nd Street, Oklahoma City, Oklahoma.    This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

a.  **A red Apple iPhone and a black Apple iPhone, Model A1660**





## ATTACHMENT B

1.     All records on the Devices described in Attachment A that relate to violations of 21 U.S.C. §§ 841 and 846 involving Ambrocio ARROYO, including:

      a.     lists of customers and related identifying information;

      b.     types, amounts, and prices of drugs smuggled as well as dates, places, and amounts of specific transactions;

      c.     any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

      d.     all bank records, checks, credit card bills, account information, and other financial records.

2.     Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

      a.     records of Internet Protocol addresses used;

      b.     records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF (1) RED APPLE IPHONE, and (2) BLACK APPLE IPHONE, MODEL A1660 SEIZED FROM AMBROCIO ARROYO AND CURRENTLY LOCATED IN SECURE STORAGE AT THE DRUG ENFORCEMENT ADMINISTRATION OFFICE IN OKLAHOMA CITY, OK | Case No. M-22-       -SM<br><br>**<u>Filed Under Seal</u>** |

## AFFIDAVIT IN SUPPORT OF
## <u>AN APPLICATION FOR A SEARCH WARRANT</u>

I, Drug Enforcement Administration (DEA) Special Agent Robin Melodick, being first duly sworn, hereby depose and state as follows:

## <u>INTRODUCTION AND AGENT BACKGROUND</u>

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property— electronic devices, as further described in Attachment A hereto—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.     I am a Special Agent (SA) of the DEA.  As such, I am "an investigative or law enforcement officer of the United States" within the

meaning of Section 2510(7) of Title 18, United States Code; that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, the offenses enumerated in Title 18, United States Code, Section 2516. I have been a SA with DEA for approximately 17 years and I have worked numerous conspiracy investigations, and complex, multi-jurisdictional investigations. I am well versed in a multitude of investigative methods, including working confidential sources, interviews, arrests, search warrants, seizure warrants, and analyzing cellular phone data.

3.      The facts set forth in this affidavit are based upon my personal observations, my training and experience, reports provided to me by other law enforcement officers, and statements made by witnesses and other concerned parties.  Since this Affidavit is being submitted for the limited purpose of establishing probable cause for the requested warrant, I have not included each and every fact known to me concerning this investigation.

4.      The property to be searched is **a red Apple iPhone with a cracked/broken panel and a black Apple iPhone, Model A1660 with a black rubber case** (hereinafter, the **Target Cell Phones**), seized from **Ambrocio ARROYO**.  The **Target Cell Phones** are currently located in secure evidence storage at the DEA Oklahoma City District Office.  The applied-for warrant would authorize the forensic examination of the **Target Cell Phones** for the purpose of identifying electronically stored data particularly described in

2

Attachment B.

5.      Based on the facts set forth in this Affidavit, there is probable cause

to believe that violations of 21 U.S.C. §§ 841 and 846 have been committed by

**ARROYO**, and other known and unknown co-conspirators. The facts in this

affidavit come from my personal observations, my training and experience, and

information obtained from other agents and witnesses. This affidavit is intended

to show merely that there is sufficient probable cause for the requested warrant

and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

6.      I submit this affidavit in support of an application for a search

warrant for the **Target Cell Phones**. An investigation has revealed that the

**Target Cell Phones** are associated with a Drug Trafficking Organization (DTO)

transporting large quantities of counterfeit trademarked tablets containing

Fentanyl through the Western District of Oklahoma. The **Target Cell Phones**

were seized incident to arrest from **ARROYO** for a violation of state and federal

controlled substance laws.

7.      On May 17, 2022, Oklahoma Highway Patrol (OHP) Trooper (Trp)

Brady Webb, was monitoring eastbound traffic on Interstate 40 (I-40) in Beckham

County, Oklahoma, near the mile-marker 9 in his marked OHP vehicle. Trp Webb

checked the speed of a 2021 white Kia Forte, bearing Louisiana license plate

number N57318, traveling eastbound at a registered speed of 79 miles per hour,

3

in a posted 75 mile per hour zone. At that time, Trp Webb proceeded to enter the roadway in order to catch up to the Kia Forte and getting it stopped near the 13-mile marker in Beckham County, Oklahoma.

8.      Once stopped, Trp Webb approached the vehicle on the passenger side and contacted the two occupants.  **ARROYO** was the driver and Destiny LOPEZ was the front passenger. Upon approach, Trp Webb immediately noticed the odor of raw marijuana emitting from the vehicle. Trp Webb advised **ARROYO** of the reason for the stop and told **ARROYO** he would be receiving a warning for the speeding violation.  Trp Webb then requested **ARROYO** exit his vehicle, with his driver's license, and take a seat in the front passenger seat of his patrol vehicle while Trp Webb issued the warning. While in the patrol vehicle completing the warning information, Trp Webb engaged **ARROYO** in casual conversation and noticed **ARROYO** had an odor of marijuana on and about his person. Upon querying the license plate of the Kia, via the OHP vehicle computer, Trp Webb, also noticed that the license plate on the vehicle had expired in April 2022.

9.      During casual conversation **ARROYO** gave implausible travel plans and Trp Webb believed **ARROYO** was being deceptive in his responses. **ARROYO** told Trp Webb that he was coming from Dallas, Texas, where he had been visiting his mother and was now traveling to Oklahoma City. Trp Webb believed **ARROYO**'s travels were implausible because of his route—the stop occurred approximately 130 miles west of Oklahoma City. If **ARROYO** were truly

4

traveling from Dallas, Texas to Oklahoma City, Oklahoma, then **ARROYO** would have been traveling northbound on I-35 and not eastbound on I-40.  When Trp Webb ran a check on the the vehicle's license plate, it was determined the vehicle was a rental.  Trp Webb asked **ARROYO** whether the vehicle was a rental, and **ARROYO** said it was a rental and that he had rented the vehicle.  Thereafter, Trp Webb returned to **ARROYO**'s vehicle to retrieve the rental paperwork for the Kia. As LOPEZ retrieved the rental paperwork, Trp Webb engaged passenger LOPEZ in casual conversation.  LOPEZ gave conflicting travel plans from what **ARROYO** had told Trp Webb. LOPEZ stated they were traveling to Tennessee so **ARROYO** could "look at" a vehicle. LOPEZ also advised they were coming from Texas but could not tell Trp Webb from which city.

10.     Trp Webb then returned to his patrol vehicle where **ARROYO** was still seated in the front passenger seat.  Trp Webb asked **ARROYO** about the odor of marijuana on him and **ARROYO** stated he had smoked marijuana earlier but had smoked all of it.

11.     Based on implausible travel plans (being off route), conflicting travel plans given by **ARROYO** and LOPEZ, the odor of marijuana emitting from the vehicle, and admitted previous usage of marijuana by **ARROYO**, Trp Webb believed there was probable cause to believe **ARROYO** and LOPEZ were engaged in criminal activity and to search the vehicle.

12.     OHP Trp Jake Sawatzky arrived to assist Trp Webb to perform a

5

probable cause search of **ARROYO** and LOPEZ's vehicle. During the search of the vehicle, Trps Webb and Sawatzky found six (6) vacuum sealed bundles, containing blue pills that Trp Webb suspected, based on his training, experience, and prior seizures of identical pills, to be fentanyl-laced counterfeit trademark Oxycodone M-30 pills. Those six bundles containing pills were recovered from inside of the rear door panels on both sides of the rental vehicle and were later determined to be a gross weight of approximately 15 pounds. During the search, law enforcement also recovered the **Target Cell Phones** from **ARROYO**.

13.    Not long after Trp Webb initiated the traffic stop on the white Kia Forte for speeding, OHP Trp Michael Eckhardt noticed a 2021 red Toyota Camry, bearing Arizona license plate number CVT2578, traveling not far behind the white Kia. Trp Eckhardt caught up to the Camry as it was passing Trp Webb's traffic stop. As soon as the Camry passed Webb's stopped vehicle, Trp Eckhardt noticed it was increasing in speed appearing to pull away from Trp Eckhardt's patrol vehicle; accelerating above the maximum posted speed limit of 75 miles per hour. At that time, Trp Eckhardt activated his radar which confirmed his observation that the Camry was in fact speeding at 80 miles per hour in a posted 75 mile per hour zone. Trp Eckhardt activated his emergency lights, signaling the Camry to pull over. It came to a stop just past the Hext Road Exit-14, located in Beckham County, Oklahoma.

14.    Trp Eckhardt made a passenger side approach to the Camry,

6

contacted the occupants and asked the driver for his license. During that initial

contact, Trp Eckhardt made several observations of the interior of the Camry to

include, notable amount of fast food and gas station trash (which is indicative of

hard non-stop travel), the passenger exhibiting signs of stress (clutching a small

silk pillow), a Christmas tree air freshener hanging from the rear-view mirror of

a rental car, and the odor of marijuana coming from within the vehicle and visibly

noticeable marijuana residue on the interior of the vehicle. Based on his training

and experience, Trp Eckhardt is aware that air fresheners are commonly used as

a masking agent for illegal odors, including marijuana. Additionally, rental cars

are not equipped with air fresheners at time of rental. The driver produced a

California driver's license in the name Daniel **OCHOA**. Trp Eckhardt requested

**OCHOA** exit the vehicle and take a seat in the front passenger seat of his patrol

vehicle while Trp Eckhardt completed the warning documentation for the

enforcement contact.

15.     Once inside the patrol vehicle, Trp Eckhardt explained to **OCHOA**

why he was stopped. **OCHOA** stated he was speeding up to get around the other

officer that had a car stopped. Trp Eckhardt reiterated to **OCHOA** that he would

be getting a warning but needed to keep his speed at or below the speed limit going

forward. At that time, Trp Eckhardt noticed that when **OCHOA** spoke, he

sounded winded.  Trp Eckhardt also noted **OCHOA** was visibly perspiring after

only being in the patrol vehicle for just a few short seconds and the perspiration

and windedness continued throughout the duration of the traffic stop. As Trp Eckhardt was filling out the warning and creating a computer aided dispatch (CAD) event to let dispatch know who was involved in the traffic stop, he continued to engage **OCHOA** in casual conversation. When asked where he and his passenger were headed, **OCHOA** stated they were going to Atlanta to go look at some dogs and "maybe" buy them. Trp Eckhardt found **OCHOA**'s statement to be an odd due to the long distance of their trip, nationwide high gas prices and the "maybe" going to buy a dog. **OCHOA** provided Trp Eckhardt with documentation that showed that the vehicle was rented by a third party. When asked what kind of dogs **OCHOA** was going to look at, **OCHOA** did not seem to know and first stated French Poodles, then French Bulldogs and then said Bulldogs and Frenchies. Trp Eckhardt noted that **OCHOA** appeared to have little confidence in his responses and yawned really big when he ran out of a response. After speaking for a few moments, Trp Eckhardt then remembered **OCHOA** from a previous traffic stop. Trp Eckhardt asked **OCHOA** if he had been traffic stopped by Trp Eckhardt before and **OCHOA** replied, "yes." After being asked about the previous traffic stop, **OCHOA** became increasingly nervous and began stuttering with his words when talking about the previous traffic stop. Trp Eckhardt asked **OCHOA** how long they would be staying in Atlanta and **OCHOA** stated until Friday or Saturday.  When asked who rented the vehicle that **OCHOA** was driving, **OCHOA** stated his friend "Ambrocio" had rented it. Trp Eckhardt then

8

asked if "Ambrocio" was the passenger in the car with him but **OCHOA** replied, no. **OCHOA** immediately explained how "Ambrocio" added **OCHOA** as an additional driver and how "Ambrocio" does rentals and why "Ambrocio" rented it. **OCHOA** said he remembered telling Trp Eckhardt during the last traffic stop that they (**OCHOA** and Ambrocio) worked at a smoke shop.

16.     Trp Eckhardt noted that when a person has been entered into the CAD system on a traffic stop, it will show any previous traffic stop information to include the location, vehicle and occupants. The previous time **OCHOA** was stopped, his passenger was Ambrocio **ARROYO** and **ARROYO** was the person who rented the vehicle for the current traffic stop but was not present in the vehicle. At that time, without **OCHOA** knowing, Trp Eckhardt contacted Trp Webb, who was still conducting his traffic stop. Trp Webb advised that **ARROYO** was the driver of the car he had stopped.

17.     At that time Eckhardt asked **OCHOA** where **ARROYO** was and **OCHOA** stated he thought he was at work but then said that he wasn't because they close early. Trp Eckhardt knew this to be a lie because Trp Webb had **ARROYO** stopped.

18.     While **OCHOA** remained in the patrol vehicle, Trp Eckhardt returned to the Camry and spoke with the passenger, identified as Kevin **TOOKS**. When asked, **TOOKS** stated they were going to Tennessee and then to Georgia to look at some dogs. At that time, Trp Eckhardt retrieved the details for the rental

9

agreement which indicated it was rented by Ambrocio **ARROYO** on May 16, 2022 and was due back to the rental company on May 22, 2022. Based on the travel plans given by **OCHOA** and the time on the rental agreement, Trp Eckhardt did not believe the travel plans coincided with the rental agreement. Once Trp Eckhardt returned to the patrol vehicle, **OCHOA** asked Trp Eckhardt if it had been raining which Trp Eckhardt noted as odd considering it was visibly wet outside and since the weather had already been discussed earlier during the stop. Trp Eckhardt asked **OCHOA** about the odor of marijuana in the vehicle and **OCHOA** stated that they had had some but they smoked it all before they got to Texas because they know how the Texas boys are. **OCHOA** then told Trp Eckhardt to go ahead and check it but there's nothing there that they needed to have a conversation about. With **OCHOA**'s given consent, Trp Eckhardt had **TOOKS** exit the Toyota Camry and sit in the patrol vehicle while Trp Eckhart conducted a search. As Trp Eckhardt was preparing to go search the Camry, he could hear **OCHOA** breathing heavily.

19.    Just before a search of the Camry was conducted, Trp Webb advised Trp Eckhardt that a trafficking quantity of what was believed to be fentanyl-laced counterfeit trademark Oxycodone M-30 pills was found inside the rear doors of the car driven by **ARROYO**. Trp Webb further stated that **ARROYO** told him he (**ARROYO**) was driving in tandem with the driver of the Camry—**OCHOA**. During the search, Trp Eckhardt found marijuana shake and residue on the front

10

passenger floorboard, all over the carpet, the console, and inside of the door handle. Trp Eckhardt also located a torn plastic baggie on the floorboard that is consistent with packaging for small amounts of illegal drugs. There was an Apple iPhone and T-Mobile phone in the passenger area where **TOOKS** had been sitting. There were also three (3) loose tools sitting next to a duffel bag. The tools were a black and yellow flat blade screwdriver, a green and black Phillips-head screwdriver, and a chrome ratchet with extension and 10mm socket. It was apparent this vehicle had been previously searched as reported to me by **OCHOA** and **TOOKS** and there was no other contraband present.

20.     Based on training, experience, and knowledge Trp Eckhardt believed **OCHOA** and **TOOKS** were involved in assisting **ARROYO** and **LOPEZ** traffic the suspected fentanyl-laced counterfeit trademark Oxycodone M-30 pills which were located and seized from the vehicle driven by **ARROYO** on Trp Webb's stop by acting as the decoy car. The purpose of a "decoy car" is to purposefully get stopped and searched in order to tie up law enforcement while a vehicle containing illegal items goes by. When handcuffing both **OCHOA** and **TOOKS** appeared to act defeated and did not question why they were being arrested, even though no large amounts of contraband was found within their vehicle.

21.     All four suspects were transported to the Sayre, Oklahoma Police Department for a secondary search of the car stopped by Trp Webb and to remove the contraband. Once the secondary search was completed, Trp Webb placed

ARROYO and LOPEZ under arrest, and Trp Eckhardt placed OCHOA and TOOKS under arrest. While at the Sayre Police Department, it was determined that the tools Trp Eckhardt had located in the Toyota Camry with OCHOA and TOOKS were the exact tools required to remove the door panel to access the intentionally concealed fentanyl-laced counterfeit trademark Oxycodone M-30 pills. The socket wrench fit the bolts that were required to be removed and the Phillips head screwdriver was necessary to unscrew a speaker before the door panel could be removed to access the pills inside of the doors.

22.     ARROYO, LOPEZ, OCHOA and TOOKS were then transported to the Beckham County jail in Sayre, Oklahoma.

23.     On May 19, 2022, SA Brook Wilson and TFO Curtis Diel took possession of the fentanyl-laced counterfeit trademark Oxycodone M-30 pills, cellular phones belonging to ARROYO, LOPEZ, OCHOA and TOOKS, as well as other items of evidentiary value, from OHP, at 3600 North Martin Luther King Jr. Blvd, Oklahoma City, OK, and transported them to the DEA Oklahoma City District Office (OCDO).   Upon arrival at the OCDO the cellular telephones belonging to ARROYO, LOPEZ, OCHOA and TOOKS, as well as the other non-drug items of evidentiary value, were placed in secure temporary storage pending processing.  SA Wilson and TFO Diel also conducted a presumptive fentanyl test on one of the pills seized from ARROYO and LOPEZ's vehicle which indicated a positive result for the presence of fentanyl.

24.     On June 8, 2022, I received an analysis report from the DEA South Central Laboratory for the pills seized from **ARROYO** and **LOPEZ's** vehicle which shows they positively contain fentanyl. The lab report also indicated that the six bundles contained a total of 55,614 pills, weighing approximately 6,052 grams.

25.     On June 1, 2022, I completed a federal complaint affidavit for **ARROYO, LOPEZ, OCHOA** and **TOOKS** for the charges of Conspiracy to Possess with Intent to Distribute a Mixture Containing Fentanyl and arrest warrants were signed by the Honorable Gary M. Purcell, Magistrate Judge for the Western District of Oklahoma.

26.     Based on the foregoing, I know that **ARROYO** was in possession of a large quantity of fentanyl-laced counterfeit trademarked Oxycodone tablets within the Western District of Oklahoma.  Moreover, the **Target Cell Phones** were in **ARROYO's** possession at the time of his arrest by OHP.  Therefore, I submit there is probable cause to believe the **Target Cell Phones** could lead to evidence furthering the investigation of the DTO in the Western District of Oklahoma and other locations.

27.     The **Target Cell Phones** are currently located in secure evidence storage at the DEA OCDO. In my training and experience, I know that the **Target Cell Phones** have been stored in a manner in which its contents are (to the extent material to this investigation) in substantially the same state as it was when the

13

**Target Cell Phones** first came into the possession of DEA Oklahoma City.

28.    Based on my training, experience, and research I know that the **Target Cell Phones** have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

29.    From my training and experience, I know that drug smuggling is often a conspiratorial crime.  Individuals who possess controlled substances with the intent to deliver them typically do so in groups with the assistance of others. Drug dealers like **ARROYO** often use their cell phones to communicate with other members of the drug trafficking organization.  Records of these communications and the contact information of the smugglers are often saved in the individual's phone.

30.    An examination can reveal the approximate location of the **Target Cell Phones** and the user by associating a specific date and time with: historical GPS data, historical cell-site data, and logs of Wi-Fi networks.  Additionally, an examination can reveal the **Target Cell Phones'** unique identifiers (phone number, IMEI, IMSI, etc.).  These unique identifiers can be used to compel material records from the cell phone service provider such as call logs, billing information, and historical cell-site data.

31.     In fact, on June 3, 2022, **LOPEZ** consented to a search of her phone. An initial review of her phone shows **LOPEZ** discussing drug transactions, at least one of which would take place at a residence belonging to **ARROYO**, via text message. Additionally, based on the information from a review of **LOPEZ's** phone and additional investigation, it appears that **LOPEZ** works closely with **ARROYO** in setting up and executing the drug transactions. It also appears that **LOPEZ** communicates via text message with a contact, "Kush Boy," which, based on statements by **LOPEZ**, is believed to be **ARROYO**. Thus, it is clear **LOPEZ** and **ARROYO** discuss their drug business via cell phone and text message. As such, there is probable cause to believe **ARROYO** uses the **Target Cell Phones** to discuss drug transactions and the details involved in conducting drug transactions.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

32.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

33.     There is probable cause to believe that things that were once stored on the **Target Cell Phones** may still be stored there, for at least the following reasons:

15

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

34. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **Target Cell Phones** were used, the purpose of their use, who used them, and when. There is probable cause to

16

believe that this forensic electronic evidence might be on the **Target Cell Phones** because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.

    b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is

17

not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

35.  *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **Target Cell Phones** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the **Target Cell Phones** to human inspection in order to determine whether it is evidence described by the warrant.

36.  *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I

submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

37.    I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the **Target Cell Phones** described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

Robin Melodick
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me on July 22 , 2022.

SUZANNE MITCHELL
United States Magistrate Judge
Western District of Oklahoma

19